IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-02112-RM-KLM

ANDREW L. JOHNSON,

     Plaintiff,

v.

TIMOTHY J. KELLISON,
CHRISTOPHER REISS, and
EUGENE MARTINEZ,

     Defendants.

_____

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

     This matter is before the Court on Defendants' **Motion for Summary Judgment**
[#70][1] (the "Motion"). Plaintiff, who is proceeding pro se,[2] filed a Response [#95] to the
Motion, Defendants filed a Reply [#96], and the Court permitted Plaintiff to file a Surreply
[#97]. *See Minute Order* [#102]. The Motion [#70] has been referred to the undersigned
pursuant to 28 U.S.C. § 636(b)(1) and D.C.COLO.L.CivR 72.1. *See* [#78]. The Court has
reviewed the briefs, the entire case file, and the applicable law, and is sufficiently advised

----

[1]  "[#70]" is an example of the convention the Court uses to identify the docket number
assigned to a specific paper by the Court's case management and electronic case filing system
(CM/ECF). This convention is used throughout this Recommendation.

[2]  The Court must construe liberally the filings of pro se litigants. *See Haines v. Kerner*, 404
U.S. 519, 520-21 (1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). However, the
Court should not be the pro se litigant's advocate, nor should the Court "supply additional factual
allegations to round out [the pro se litigant's] complaint or construct a legal theory on [his] behalf.*"
*Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (citing *Hall*, 935 F.2d at 1110).
In addition, pro se litigants must follow the same procedural rules that govern other litigants.
*Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994).

in the premises.  For the reasons set forth below, the Court respectfully **RECOMMENDS** that the Motion [#70] be **GRANTED in part and DENIED in part**.

### I.  Summary of the Case[3]

At the outset, the Court notes that Plaintiff has not explicitly admitted or denied Defendants' recitation of the case, as provided in the Motion [#70].  Thus, the Court essentially adopts Defendants' recitation to the extent it appears well-supported by the evidence and to the extent that Plaintiff has not directed the Court's attention to, nor actually provided, opposing evidence elsewhere in his briefs.

Plaintiff is a former inmate who, at all times relevant to this lawsuit, was held at the Boulder County Jail ("BCJ") as a pretrial detainee.  Plaintiff was arrested for a bond violation and brought to BCJ on October 19, 2017.  *Defs.' Ex. A* [#70-1] (copies of entries into Plaintiff's electronic Inmate Record contained in the Jail Management System).  While waiting to complete the booking process, Plaintiff twice used the telephones in the booking area waiting room, once for about four minutes and the second time for about sixteen minutes.  *Defs.' Ex. B* [#70-2, #73] (two videos from two different angles of the waiting room showing each of the calls).

At 6:55 a.m. the next morning, October 20, 2017, Plaintiff was formally booked and transferred to cell 9 on the second floor of BCJ's intake module.  *Defs.' Ex. D* [#70-7] at 1.

---

[3]  The Court construes the evidence in a light most favorable to Plaintiff as the nonmovant here.  *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1186 (10th Cir. 2015) ("We . . . recit[e] all summary-judgment evidence in the light most favorable to . . . the nonmovant.").  The Court notes that, pursuant to 28 U.S.C. § 1746, Plaintiff swore to his Amended Complaint [#6] under penalty of perjury, and therefore this document may be treated as an affidavit and used as evidence on a motion for summary judgment.  *Green v. Branson*, 108 F.3d 1296, 1301 n.1 (10th Cir. 1997); *Pacheco v. Timme*, No. 11-cv-02530-RM-KLM, 2014 WL 2442111, at *4 n.2 (D. Colo. May 30, 2014).

(copy of an incident report regarding the incident involving Plaintiff the morning of October 20, 2017).  Shortly thereafter, Plaintiff approached Deputy Theron Crawford ("Crawford"), a non-party, while he was completing paperwork in the officer workstation.  *Id.*  Plaintiff requested various items such as a KITE request form, paper, pencils, and a grievance form.  *Id.*  Deputy Crawford asked Plaintiff why he wanted a grievance form.  *Id.*  Plaintiff apparently became belligerent, telling Deputy Crawford that it was his constitutional right to get a grievance form and demanding to see a sergeant.  *Id.*  Deputy Crawford told Plaintiff to go to lockdown and that he would give him his requested items when he completed his paperwork.  *Id.*  Plaintiff refused.  *Id.*  Deputy Crawford repeated his order for Plaintiff to go to lockdown several times, but Plaintiff still refused.  *Id.*

Deputy Crawford left his workstation and entered the intake module along with Deputy C. Howland ("Howland"), another non-party.  *Id.*  Deputy Crawford once again told Plaintiff to go lockdown immediately.  *Id.*  Plaintiff raised his voice, puffed out his chest, and demanded that Deputy Crawford provide him with a second grievance form so that he could grieve Deputy Crawford for "being an asshole."  *Id.*; *Defs.' Ex. E* [#70-8] at 1 (copy of a second incident report regarding the incident involving Plaintiff the morning of October 20, 2017).  Deputy Howland called for back-up and several other deputies arrived.  *Ex. D* [#70-7] at 1; *Ex. E* [#70-8] at 1.  Plaintiff eventually went up the stairs and entered cell 9 but refused to close the door after Deputy Crawford instructed him to do so.  *Ex. D* [#70-7] at 1-2.  Deputy Crawford closed the door himself and determined that Plaintiff should serve a two-day module segregation for his refusal to follow instructions, although this was later reduced to one day.  *Id.* at 2.

At 9:30 a.m., Deputy Sheree Fournet ("Fournet"), another non-party, removed

Plaintiff from his cell so that he could meet with his Public Defender.  *Ex. E* [#70-8] at 1; *Defs.' Ex. F* [#70-9] (copy of the entry into Plaintiff's electronic Inmate Record contained in the Jail Management System).  Plaintiff met with his attorney in the multi-purpose room, after which Deputy Fournet escorted him back to cell 9.  *Ex. E* [#70-8] at 1.  Deputy Fournet informed Plaintiff at this time that he would be serving a two-day module segregation for his actions earlier that morning.  *Id.*  When he reached his cell, Deputy Fournet had to tell Plaintiff numerous times to go into his cell and shut the door.  *Id.*

At 10:45 a.m., Deputy Fournet, along with another non-party jail official, served lunch to Plaintiff in his cell.  *Id.* at 1-2.  As she was leaving, Deputy Fournet attempted to close the cell door behind her, but Plaintiff put his foot in front of the door and demanded that he be allowed to call his private attorney regarding a court appearance that Plaintiff was scheduled to attend that day in Larimer County.  *Id.* at 2.  Deputy Fournet told Plaintiff that she would not permit the phone call and instructed Plaintiff three times to remove his foot so that she could close the door.  *Id.*  Plaintiff refused.  *Id.*  Deputy Fournet radioed for back-up, and Defendant Timothy J. Kellison ("Kellison") and Defendant Eugene Martinez ("Martinez") responded to the call along with Deputy Amber McNeil ("McNeil"), Deputy Chad Palmer ("Palmer"), and Deputy Stephen Gerhart ("Gerhart"), all three of whom are not parties to this action.  *Id.* at 2-9.

Defendant Kellison and Deputy Fournet talked with Plaintiff for several minutes, but Plaintiff continued to refuse to obey their directions.  *Id.* at 1-2, 7-11; *Defs.' Ex. G* [#70-10, #73] (video of jail module area).  When their attempts to de-escalate the situation failed, Defendant Kellison stepped in and pushed Plaintiff back into the cell.  *Ex. E* [#70-8] at 7.  As Defendant Kellison attempted to shut the door, Plaintiff kicked the door toward

-4-

Defendant Kellison and other jail personnel. *Id.* at 4, 6-7, 10. Reopening the door, Defendant Kellison drew his taser, pointed it at Defendant, and told Defendant to turn around and place his hands behind his back. *Id.* at 8. Plaintiff complied with this direction. *Id.* Defendant Kellison then entered the cell and placed Plaintiff in handcuffs. *Id.* Defendant Kellison, Defendant Martinez, and Deputies Foster, McNeil, and Gerhart, as well as a previously unmentioned jail official named Sergeant Heger, escorted Plaintiff out of his cell and down the stairs of the module, as shown by the surveillance video. *Id.* at 2-4, 6-9; *Ex. G* [#70-10, #73]. Plaintiff resisted by dragging his feet and being verbally abusive and antagonistic. *Ex. E* [#70-8] at 2-4, 6-9.

At the bottom of the stairs, multiple deputies worked to place Plaintiff in a restraint chair, as Plaintiff continued to physically resist, threaten physical violence, and call jail staff "faggots," "pussies," and "mother fuckers." *Id.* at 4. Defendant Christopher Reiss ("Reiss") arrived around this time, and his body-worn camera's video generally confirms these events. *Defs.' Ex. H* [#70-11, #73]. Once secured in the restraint chair, Jail Nurse McGurk checked Plaintiff's restraints to ensure that they were not too tight. *Id.*; *Ex. E* [#70-8] at 6-7; *Defs. Ex. I* [#70-12] (copy of the Chart Note Entries made into Plaintiff's medical record by members of the Health Services Unit medical staff). Plaintiff was then moved to a cell in the disciplinary module at approximately 10:52 a.m. *Ex. E* [#70-8]; *Ex. H* [#70-11, #73]. As confirmed by video, Defendant Reiss checked on Plaintiff at 2:00 p.m. and asked if he was ready to get out of the chair. *Ex. H* [#70-11, #73]. After a lengthy conversation with Plaintiff, Defendant Reiss stated he would return when Plaintiff was ready to get out of the chair. *Id.* At 2:30 p.m. two deputies and a nurse double-checked Plaintiff's ankle restraints to ensure they were not too tight. *Ex. E* [#70-8] at 3, 7. As confirmed by video, Defendant

Reiss returned at 3:44 p.m. and released Plaintiff from the chair.  *Ex. H* [#70-11, #73].  Jail medical staff was present and noted no injury on Plaintiff other than some scrapes on the back of his left heel.  *Ex. E* [#70-8] at 3-4; *Ex. I* [#70-12] at 2.  There is no evidence that Plaintiff requested medical attention while at BCJ as a result of being in the restraint chair.

In the present Motion [#70], Defendants seek entry of summary judgment in their favor on all claims.  Defendants initially construed the Amended Complaint [#6] as asserting four claims: (1) First Amendment access to the courts; (2) Fourteenth Amendment excessive force; (3) Fourteenth Amendment procedural due process; and (4) First Amendment retaliation.  *See generally Motion* [#70].  Plaintiff's Response confirms these four claims but also asserts that he raised a Fourteenth Amendment claim regarding conditions of confinement.  *See* [#95] at 13-20.  Defendants therefore address this claim for the first time in their Reply [#96], and the Court therefore permitted Plaintiff to file a Surreply [#97].  *Minute Order* [#102].  Plaintiff seeks only monetary relief in this case.  *Am. Compl.* [#6] at 13.

## II.  Standard of Review

The purpose of a motion for summary judgment pursuant to Fed. R. Civ. P. 56 is to assess whether trial is necessary.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Under Fed. R. Civ. P. 56(c), summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  An issue is genuine if the evidence is such that a reasonable jury could resolve the issue in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 277 U.S. 242, 248 (1986).  A fact is material if it might affect the outcome of the case under the governing substantive

law.  *Id.*

The burden is on the movant to show the absence of a genuine issue of material fact.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 323).  When the movant does not bear the ultimate burden of persuasion at trial, the "movant may make its prima facie demonstration [of the absence of a genuine issue of material fact] simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."  *Id.* at 671.  If the movant carries the initial burden of making a prima facie showing of a lack of evidence, the burden shifts to the nonmovant to put forth sufficient evidence for each essential element of his claim such that a reasonable jury could find in his favor.  *See Anderson*, 277 U.S. at 248; *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999).  The nonmovant must go beyond the allegations and denials of his pleadings and provide admissible evidence, which the Court views in the light most favorable to him.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995) (citing *Celotex*, 477 U.S. at 324).  Conclusory statements based merely on conjecture, speculation, or subjective belief are not competent summary judgment evidence.  *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).   The nonmoving party's evidence must be more than "mere reargument of [his] case or a denial of an opponent's allegation" or it will be disregarded.  *See* 10B Charles Alan Wright et al., *Federal Practice and Procedure* § 2738 (4th ed. 2017).

When ruling on a motion for summary judgment, a court may consider only admissible evidence.  *See Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1209-10 (10th Cir. 2010).  The factual record and reasonable inferences therefrom are viewed in the light most

favorable to the party opposing summary judgment. *Concrete Works, Inc., v. City & Cty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). At the summary judgment stage of litigation, a plaintiff's version of the facts must find support in the record. *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Thomson*, 584 F.3d at 1312.

Only documents that meet the evidentiary requirements of Fed. R. Civ. P. 56 may be considered for purposes of summary judgment. Rule 56(c) provides that:

> (1) A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]
>> . . .
> (3) Materials Not Cited. The court need consider only the cited materials, but it may consider other materials in the record.
> (4) Affidavits or Declarations. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c)(1)-(4).

## III.  Analysis

At the outset, the Court reiterates that the evidence that Plaintiff offers in opposition to summary judgment must include more than conclusory or vague statements in order to create a genuine issue of material fact with respect to Defendants' evidence. *See Ford v. West*, 222 F.3d 767, 777 (10th Cir. 2000) ("Vague, conclusory statements do not suffice

to create a genuine issue of material fact.").  Therefore, the Court may not accept Plaintiff's "disagreements" with Defendants' supported facts unless Plaintiff directs the Court's attention to evidence in the record which supports his "disagreements."  *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988) (stating that "mere conjecture" is an insufficient basis for denial of summary judgment).

The Court notes that Plaintiff has provided references to evidence by Bates numbering (and a few other references to certain non-Bates-numbered evidence), but has not provided any of that evidence to the Court or directed the Court's attention to where that evidence may be located in the Court record, which includes evidence provided by Defendants in the Motion [#70] and Reply [#96].  Where obvious, the Court has attempted to match the Bates numbers and other evidence mentioned by Plaintiff to Defendants' exhibits, although this has not been possible with respect to every reference made by Plaintiff.  Nevertheless, the Court emphasizes that it is not the Court's duty to sift through the record and undertake this task on Plaintiff's behalf, and attempts to direct the Court's attention to the precise location of any evidence purportedly supporting Plaintiff's case remain Plaintiff's responsibility.  *See* Fed. R. Civ. P. 56(c); *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005) (stating that the general rule that pro se pleadings must be construed liberally has limits and that "the court cannot take on the responsibility of serving as the litigant's attorney in constructing arguments and searching the record").

It is clear that a pro se litigant's pleadings are held "to less stringent standards than formal pleadings drafted by lawyers."  *Haines v. Kerner*, 404 U.S. 519, 520 (1972).  This includes at the summary judgment stage of proceedings.  *See Overton v. United States*,

925 F.2d 1282, 1283 (10th Cir. 1991).  The Court must overlook a pro se litigant's "failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements."  *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  However, it is not "the proper function of the district court to assume the role of advocate for the pro se litigant."  *Id.*  This means that the Court may not manufacture arguments out of whole cloth for him.  *Acker v. Dinwiddie*, 516 F. App'x 692, 693 (10th Cir. 2013) ("To be sure, it is well-settled that we read a pro se litigant's petition with a special solicitude.  But we are not his advocates, and we cannot create arguments on his behalf out of whole cloth."); *Tucker v. United States Court of Appeals for the Tenth Circuit*, 815 F. App'x 292, 293 n.1 (10th Cir. 2020) (stating that the Court must "stop short of serving as [the pro se litigant's] advocate or crafting arguments on his behalf"); *United States v. Pinson*, 584 F.3d 972, 975 (10th Cir. 2009) ("[T]his rule of liberal construction stops, however, at the point at which we begin to serve as his advocate.").  In other words, the Court is not obligated to craft arguments and perform the necessary legal research where the pro se litigant's briefs address the opposing arguments only "in a perfunctory manner, unaccompanied by some effort at developed argumentation."  *United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004) (internal quotation marks omitted).

Here, it is clear that Defendants are seeking entry of summary judgment in their favor on all claims asserted by Plaintiff.  *See generally Motion* [#70]; *Reply* [#96].  It is equally clear that Plaintiff has done an admirable job of developing legal arguments in opposition to the Motion [#70] with respect to some of his claims.  *See generally Response* [#95]; *Surreply* [#97].  However, while the Court liberally construes Plaintiff's arguments in his briefs, the Court finds that Plaintiff has essentially abandoned any claim against any

Defendant for which there is not at least "some effort at developed argumentation."  *See Wooten*, 377 F.3d at 1145.  The Court applies this framework to each of Plaintiff's five claims as specified below.

**A.    First Amendment**

**1.    Access to the Courts**

Plaintiff asserts that Defendants impeded his "attendance at his first appearance/bond hearing/probable cause hearing."  *Response* [#95] at 8.  He also avers that his right to choose his attorney was affected by his inability to attend the hearing.  *Id.* He argues that any unnecessary delay in his hearing demonstrates injury, and that, if Defendants truly considered him a high risk due to his behavior, that he should have still been permitted to attend his court hearing with restraints, including a belly chain, hand cuffs, and leg irons.  *Id.* at 8-9.

An inmate's right of access to the courts is well-established.  *See, e.g.*, *Bounds v. Smith*, 430 U.S. 817 (1977); *Lewis v. Casey*, 518 U.S. 343, 350-51 (1996).  However, among other things, an inmate must provide evidence of a *specific* injury or impact on a particular lawsuit, without which his claim fails.  *See, e.g.*, *Simkins v. Bruce*, 406 F.3d 1239, 1243-44 (10th Cir. 2005) (recognizing a sufficient showing of actual injury where prisoner demonstrated specific impact on prosecution of a particular case).

Plaintiff was arrested on October 19, 2017, for alleged violation of his bail bond set in Case No. 17CR000462.  *Ex. A* [#70-1]; *Defs.' Ex. FF* [#96-3] at 8.  Plaintiff had access to telephones at BCJ that day and, indeed, made two telephone calls while waiting to complete the booking process.  *Ex. B* [#70-2, #73].  At 9:30 a.m. the next day, Deputy Fournet escorted Plaintiff to the multi-purpose room, where Plaintiff met with a Public

Defender.  *Ex. E* [#70-8] at 1; *Ex. F* [#70-9].  The incident leading to Plaintiff's restraint

began about 10:45 a.m., when Plaintiff was being served his lunch.  *Ex. E* [#70-8] at 1-2.

As described below, Plaintiff's claim appears to revolve around two separate criminal

cases, both of which had hearings set for October 20, 2017, one at 11:00 a.m. and one at

1:30 p.m.  *See Am. Compl.* [#6] at 4, 8-10.

      The evidence shows that *The People of the State of Colorado v. Andrew Lynn

Johnson*, Case No. 2017CR000360, was initiated on February 15, 2017.  *Defs.' Ex. J* [#70-

13].  As relevant here, a Motions Hearing was originally set by the state court for October

13, 2017, one week before this incident.[4]  *Ex. J* [#70-13].  That hearing was continued by

the parties to 11:00 a.m. on October 20, 2017.  *Id.*  The Motions Hearing was again

continued at the parties' request to October 27, 2017, and was later continued once more,[5]

to November 17, 2017.[6]  *Id.*  Plaintiff was sentenced to three years imprisonment on

December 20, 2017, receiving credit for time served.  *Id.*;  *Defs.' Ex. EE* [#96-2].

      It is unclear whether Plaintiff's asserted injury here was (a) not being able to call his

attorney prior to the October 20 hearing, or (b) not being able to call into the court either

to participate in the hearing or to notify the court of his incarceration, or (c) both.  *See, e.g.*,

*Ex. E* [#70-8] at 2 (stating that Plaintiff "began to argue about making a phone call to

---

    [4]  Although unspecified on the state court's docket sheet, Defendants state that the motion underlying the hearing was Plaintiff's motion to withdraw his guilty plea.  *Motion* [#70] at 6 n.4. Defendants further state that the motion was ultimately denied on November 17, 2017.  *Id.*

    [5]  The state court docket sheet states that this October 27 hearing was continued by the parties, but Defendants state elsewhere that the hearing was continued by the court because of a scheduling conflict.  *Motion* [#70] at 6 n.4.  This issue is immaterial to resolution of the present Motion [#70], however.

    [6]  Although unspecified on the state court's docket sheet, Defendants state that Plaintiff's motion to withdraw his guilty plea was denied at this time.  *Motion* [#70] at 6 n.4.

Larimer county as he had court at 1100"); *Am. Compl.* [#6] at 4-5 (stating that Defendants were "impeding my communication with my attorney who was appearing on my Larimer County Case # 17CR360 at 11am [and] he therefore entered the hearing unaware of my situation & couldn't present my situation to that court at that time resulting in a no bond hold & longer incarceration").   Regardless, there is no evidence before the Court to support Plaintiff's conclusory statement that the delay in the October 20 hearing caused Plaintiff to be incarcerated longer than he otherwise would have been, given that there is no evidence that the Larimer County District Court took any action at the October 20 hearing beyond merely continuing it to October 27, or that the Larimer County District Court would have taken any action at that time to shorten Plaintiff's incarceration period.   *See, e.g.*, *Am. Compl.* [#6] at 5.   Therefore, Plaintiff has failed to show any actual injury from not being permitted to attend a hearing at which a court took no action.   Thus, in the absence of any evidence of actual injury, Plaintiff's claim regarding access to the courts fails to the extent it is based on the October 20 hearing in Case No. 2017CR000360.   *See Cosco v. Uphoff*, 195 F.3d 1221, 1224 (10th Cir. 1999) (stating that conclusory allegations of injury will not suffice).[7]

Second, *The People of the State of Colorado v. Andrew Lynn Johnson*, Case No. 2017CR002100, was initiated on October 20, 2017, in connection with Plaintiff's alleged

---

[7]   The Court also notes that there is no indication that Plaintiff was prevented from all communication with his counsel for an extended period.   Courts have found much greater restrictions do not rise to the level of a constitutional violation.   *See, e.g.*, *Hardesty v. Saline Cty. Jail*, No. 19-3211-SAC, 2020 WL 1547823, at *1-3 (D. Kan. Apr. 1, 2020) (holding that the plaintiff failed to adequately allege that the jail staff prevented his access to the courts or caused him an actual injury even where the plaintiff alleged that he was not allowed to call his attorney, that he was denied visitation rights, that he could only contact his attorney by mail, and that he was charged for paper and envelopes).

bail violation. *Defs.' Ex. HH* [#96-5]. Plaintiff's Hearing on Advisement was initially scheduled for 1:30 p.m. that day in the Boulder County District Court, but it was "Held and Continued" to October 23, 2017. *Id.* Plaintiff states that his failure to appear at this October 20 hearing "resulted in longer incarceration, reputational harm & loss of support." *Am. Compl.* [#6] at 6.

As to his first point, there is no evidence before the Court that Plaintiff remained incarcerated for a longer period than he otherwise would have been had he attended the hearing on October 20, 2017, rather than attending the continued hearing three days later, on October 23, 2017. In fact, there is no indication before the Court that Plaintiff was ever released prior to his trial in this case. *See Defs.' Ex. GG* [#96-4].

As to his second point, there is similarly no evidence before the Court regarding any actual injury incurred by Plaintiff as a result of his alleged reputational harm.

As to his third point, Plaintiff states that his boss Pete Williams ("Williams") was present at the hearing that Plaintiff missed with an attorney he had retained for Plaintiff, and that Mr. Williams was ready to pay Plaintiff's bond. *Am. Compl.* [#6] at 8. However, Plaintiff asserts that, because he did not show up for the hearing, Mr. Williams decided not to pay the attorney to represent him or to pay Plaintiff's bond. *Id.* Regardless, there is no evidence that Plaintiff incurred any actual injury by not having Mr. Williams' unnamed attorney represent him. Further, there is no evidence that Plaintiff would have been released on bond, regardless of whether Mr. Williams, or anyone else for that matter, volunteered to post bond for him. Thus, again, Plaintiff has failed to present evidence of any actual injury to his criminal defense. *See Cosco*, 195 F.3d at 1224.

Finally, the Court notes that Plaintiff cites *May v. Sheahan*, 226 F.3d 876, 883-84

(7th Cir. 2000).  *Surreply* [#97] at 3.  There, the Seventh Circuit Court of Appeals held that the following allegations were sufficient to survive a motion to dismiss: "Plaintiff will not be taken to any scheduled court appearances thereby delaying the final disposition of his case; causing him to remain in custody for a longer period of time; preventing him from requesting a lowering of his bond as a result of his serious illness; delaying all other motions which require his personal attendance; and impeding his access to his attorney." *May*, 226 F.3d at 883.  In other words, the plaintiff there alleged that the defendant's "restrictive hospital detainee policies preclude him from appearing in court, impede his access to his attorney, and prevent him from assisting in his own defense." *Id.*  The *May* case is easily distinguishable from the present case, however, because Plaintiff here was purportedly prevented from attending one hearing in each of two cases, each of which was rescheduled within 3-7 days, rather than being prevented from attending all hearings for an extended period, as alleged in *May*.

Because there is no genuine issue of material fact regarding Plaintiff's First Amendment claim for denial of access to the courts, the Court **recommends** that summary judgment enter in favor of Defendants on that claim.

### 2.    Retaliation

Plaintiff here develops argument only with respect to Defendant Kellison.  *Response* [#95] at 9-10.  The Court therefore finds that Plaintiff has abandoned this claim insofar as it may have originally pertained to any other Defendant.  *See Wooten*, 377 F.3d at 1145.

"Prison officials may not retaliate against or harass an inmate because of the inmate's exercise of his right of access to the courts."  *Smith v. Maschner*, 899 F.2d 940,

947 (10th Cir. 1990) (describing a prison official's retaliation after inmate had filed grievances against the prison official). "It is well established that an act in retaliation for the exercise of a constitutionally protected right is actionable under . . . Section 1983 even if the act, when taken for a different reason, would have been proper." *Id.* at 948. However, the plaintiff must demonstrate "*specific facts* showing retaliation because of the exercise of the prisoner's constitutional rights." *Peterson*, 149 F.3d at 1144 (internal quotation marks omitted) (emphasis in original).

Plaintiff may prove retaliation by showing the following: "(1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1203 (10th Cir. 2007). In connection with the third element, Plaintiff must show that "but for the retaliatory motive, the incidents to which he refers, including the disciplinary action, would not have taken place." *Turner v. Falk*, 632 F. App'x 457, 460 (10th Cir. 2015). Defendants' argument focuses solely on the second and third elements of this claim. *Motion* [#70] at 16-17; *Reply* [#96] at 9-10.

Regarding the second element of his claim, i.e., whether Defendant Kellison's actions caused Plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, Plaintiff points to two incidents: (1) a physical push by Defendant Kellison which Plaintiff characterizes as intimidation or harassment, and (2) moving Plaintiff from his own cell to a disciplinary cell pending a disciplinary hearing. *Response* [#95] at 10. Plaintiff does not here assert that use of the restraint chair was

-16-

retaliatory.  *See generally id.* at 9-10.

In support of this claim, Plaintiff directs the Court's attention to Defendant Kellison's incident report statement.  *Id.* (citing *Ex. E* [#70-8] at 8).  There, Defendant Kellison stated:

> [A]t 1045 when the call came again from Intake I suspected that [Plaintiff] was once again creating problems for the deputies. . . .  I went to [cell] #9 and listened while Fournet and Palmer tried to reason with [Plaintiff]. [Plaintiff] was in his cell but was physically blocking the deputies from closing the cell door.  [Plaintiff] was demanding to use the phone to call his lawyer. I informed [Plaintiff] that this would have to wait because he is serving a lock down for his actions this morning.  [Plaintiff] argued that I could not deny him a phone call.  I told him he would get plenty of opportunities to make a call, but because he is currently in lockdown, he would have to wait.  After several minutes of trying to reason with [Plaintiff] it became clear to me that [Plaintiff] would not respond to reason.  I stepped into the cell to physically move [Plaintiff] out of the way so the door could be closed.  [Plaintiff] pushed back and resisted, but I was able to move him out of the way.  I began to close the door, but [Plaintiff] grabbed at the door and again blocked the door with his foot.  At this point I considered [Plaintiff's] actions to be a direct threat to jail security.  I pushed the door open and ordered [Plaintiff] to turn and place his hands behind his back, while drawing my Taser from the holster.

*Ex. E* [#70-8] at 8.

Plaintiff further directs the Court's attention to Defendant Martinez's incident report statement.  *Response* [#95] at 10 (citing *Ex. E* [#70-8] at 6).  There, Defendant Martinez stated:

> At this point [Defendant] Kellison then stepped in and pushed him back with his right hand on [Plaintiff's] right shoulder and told him in a loud voice to move back.  [Plaintiff] did step back and as [Defendant] Kellison was shutting the door, [Plaintiff] kicked the door.  At this point, [Defendant] Kellison then said, "Ok, that is it" pulled out his taser and told him to turn around and place his hands behind him.  [Plaintiff] did turn around and Deputy Palmer cuffed [Plaintiff].  They backed out of the cell and he was told to walk downstairs.

*Ex. E* [#70-8] at 6.

The Court finds that the second element of a retaliation claim is not met by a single push to the shoulder which caused Plaintiff to take a step back into his cell away from the

door, especially when there is no evidence of accompanying adverse effects such as personal injury/pain.  "Not 'every response to a prisoner's exercise of a constitutional right gives rise to a retaliation claim.'"  *Powell v. Laurie*, No. 16-3251-SAC-DJW, 2017 WL 3458797, at *5 (D. Kan. Aug. 11, 2017) (quoting *Dawes v. Walker*, 239 F.3d 489, 492-93 (2d Cir. 2001)).   A de minimus injury is insufficient to support the second element of a retaliation claim.  *Shero*, 510 F.3d at 1203.  "This is especially true in the prison setting, where courts generally require a greater showing of injury."  *Blount v. Marin*, No. 19-cv-00500-DDD-MEH, 2020 WL 5230711, at *11 (D. Colo. Sept. 2, 2020) (citations omitted).

Similarly, the Court finds that this element is not met simply by temporarily moving Plaintiff to a "noisy & smelly" cell by himself, especially where there is no evidence such as, by way of example only, noise level preventing sleep for an extended period or uncleanliness from human bodily fluids.  *See Am. Compl.* [#6] at 5 (stating that Plaintiff was moved to a "cell in a sub day room in seg where it is noisy & smelly"); *see, e.g., Hunnicutt v. DeSantiago*, 429 F. Supp. 3d 905, 918 (D.N.M. 2019) (holding that a single night in administrative segregation and subsequent transfer to a less desirable housing unit, without more, is insufficient to demonstrate an "adverse action"); *Routt v. Howard*, 764 F. App'x 762, 769-70 (10th Cir. 2019) (discussing lack of sufficient injury in the conditions-of-confinement context when an officer on the night shift yelled in the cells, loudly pounded on glass with keys, and otherwise made it hard to sleep where there was no evidence of long-term exposure to the noisy nighttime conditions); *but see, e.g., Penrod v. Zavaras*, 94 F.3d 1399, 1404 (10th Cir. 1996) (finding retaliation when prison officials transferred the inmate to administrative segregation for an unspecified period *and* threatened him with further retaliation if he continued complaining).

Plaintiff cites *Sayed v. Virginia*, 744 F. App'x 542 (10th Cir. 2018), for the proposition that prison officials may not retaliate or harass an inmate because of the inmate's exercise of his right of access to the courts.  *Response* [#95] at 10.  However, the allegations in that case were far more severe than the situation here.  As summarized by the Tenth Circuit Court of Appeals in finding that the plaintiff had stated a retaliation claim, the plaintiff alleged:

> Mr. Sayed was called to [the prison's] control center, where he was met by defendants Captain Michael Tidwell, Lieutenant Page Virginia, Sergeant Robert Hradecky, and two unknown officers.  Capt. Tidwell ordered him to step out to a vestibule area to discuss a grievance he filed against Lt. Virginia.  Once outside, Capt. Tidwell immediately struck Mr. Sayed with his fist on the right side of his face, causing immense pain and injury to his right eye.  Mr. Sayed staggered backwards, raising his hands to fend off additional blows and begging for an explanation as to why he was hit.  Capt. Tidwell screamed that Mr. Sayed was snitching and if he did not stop, he would hit him every time he saw him.  Mr. Sayed attempted to move away but he was tackled by Sgt. Hradecky and the two other unknown officers.  Mr. Sayed was then restrained and punched and kicked by all, including Capt. Tidwell, who struck him in the head and neck area repeatedly.  Mr. Sayed was unsure whether Lt. Virginia participated in the assault, but he knew she did not stop it.
>
> At one point during the melee, Capt. Tidwell grabbed Mr. Sayed's little finger on his right hand and twisted it, breaking it willfully and intentionally.  He then stated, "We're even now."  Afterwards, he announced on the intercom to all other inmates: "Hey everybody, Mr. Sayed is a federal informant and a snitch and he's serving a sentence for sexual assault and has a fake mittimus."  He then turned to Mr. Sayed and said, "See how we deal with snitches in S.C.F."  Mr. Sayed was put in segregation and was later transferred to the state penitentiary. He was also served with false disciplinary reports, convicted of said disciplinary violations, and then charged with criminal assault against the officers.  He avers that he now suffers a permanent disability in his right hand.

*Sayed*, 744 F. App'x at 544 (internal brackets, citations, and some quotation marks omitted).  Here, Plaintiff's evidence of retaliation is far less severe and does not rise to the level of an injury that would chill a person of ordinary firmness from continuing to engage

in that activity.  *See Shero*, 510 F.3d at 1203.

Accordingly, because of the absence of a genuine issue of material fact and Defendant's entitlement to judgment as a matter of law, the Court **recommends** that judgment enter in favor of Defendant Kellison and against Plaintiff on Plaintiff's retaliation claim.

**B.     Fourteenth Amendment**

**1.     Excessive Force**

Plaintiff here develops argument only with respect to Defendant Kellison.  *Response* [#95] at 10-13.  The Court therefore finds that Plaintiff has abandoned this claim insofar as it may have originally pertained to any other Defendant.  *See Wooten*, 377 F.3d at 1145.

Plaintiff appears to complain about two specific uses of force.  *Response* [#95] at 12-13.  First, Defendant Kellison "applied force & physically pushed me into the cell."  *Am. Compl.* [#6] at 5.  Second, when Plaintiff was being transferred to another cell, Defendant Kellison took him to the ground and placed him "in a rear naked choke hold," cutting off Plaintiff's air, "smother[ing]" him and "covering [his] nose & mouth."  *Id.* at 6.  Defendant Kellison then "applied an infra orbital pressure point grinding his open palm into [Plaintiff's] nose & making circle motions causing severe pain & causing [him] to bleed."  *Id.*  There is no indication in the Response [#95] that Plaintiff bases this claim on use of the restraint chair.  *See generally Response* [#95] at 10-13.

The due process clause of the Fourteenth Amendment "protects a pretrial detainee from the use of force that amounts to punishment."  *Kemmerly v. Hill*, 814 F. App'x 378, 384 (10th Cir. 2020) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)).  "[F]ollowing

*Kingsley*, we no longer apply an identical analysis to an excessive force claim regardless of whether the claim arises under the Fourteenth or Eighth Amendment." *Ullery v. Bradley*, 949 F.3d 1282, 1296 n.5 (10th Cir. 2020). *Kingsley* "deleted the subjective prong of the Fourteenth Amendment analysis." *Id.* "[A] pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kemmerly*, 2020 WL 2535930, at *4 (quoting *Kingsley*, 576 U.S. at 397 (stating in connection with a pretrial detainee's Fourteenth Amendment excessive force claim that negligence is not enough; rather, to be actionable, the conduct must be purposeful, knowing, or possibly reckless)).

The Tenth Circuit Court of Appeals has recently affirmed that "the same objective standard now applies to excessive-force claims brought under either the Fourth or Fourteenth Amendment." *McCowan v. Morales*, 945 F.3d 1276, 1283 n.6 (10th Cir. 2019). Examples of factors the Court may consider in determining objective reasonableness include: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397.

In the Fourth Amendment excessive force context, the Tenth Circuit Court of Appeals has recently cautioned that, at the summary judgment stage of proceedings, a district court must remain cognizant that (1) "allowance needs to be made for the fact" that officers are often required to "make split-second decision[s]," and (2) that "the facts must be viewed from the perspective of the officer," i.e., whether the officer's actions were reasonable based on what the evidence shows that officer was aware of at the time of his

or her action.  *Estate of Valverde by & through Padilla v. Dodge*, 967 F.3d 1049 (10th Cir. July 30, 2020).

### a.    Use of Force at Plaintiff's Cell

Given the absence of a genuine issue of material fact regarding whether Plaintiff was blocking the door immediately prior to Defendant Kellison pushing Plaintiff back into his cell, the Court finds that Defendant Kellison's use of force here was not "excessive."  The undisputed evidence shows that officers tried to reason with Defendant Kellison for several minutes before Defendant Kellison pushed Plaintiff back into his cell using one hand on Plaintiff's shoulder.  *See Ex. G* [#73] (video evidence).  There is no evidence of any immediate injury or even of later injury, such as bruising.  There is no evidence that Plaintiff fell or endured any consequences other than being forced to take a step back into his cell.  Under these circumstances, there is no genuine issue of material fact, and no reasonable jury could find that Defendant Kellison's use of force was objectively unreasonable.  *See Kemmerly*, 2020 WL 2535930, at *4.

Accordingly, the Court **recommends** that the Motion [#70] be **granted** regarding the incident where Defendant Kellison pushed Plaintiff into his cell prior to the transfer, and that judgment enter in Defendant Kellison's favor on this aspect of Plaintiff's excessive force claim.

### b.    Use of Force During the Transfer

### i.    Violation of a Constitutional Right

Here, in short, Plaintiff contends that when he was being transferred to another cell, Defendant Kellison took him to the ground and placed him "in a rear naked choke hold,"

cutting off Plaintiff's air, "smother[ing]" him and "covering [his] nose & mouth." *Am. Compl.* [#6] at 6.  Defendant Kellison then "applied an infra orbital pressure point grinding his open palm into [Plaintiff's] nose & making circle motions causing severe pain & causing [him] to bleed." *Id.*

Defendants argue that none of the videos show an objective use of force here, and the Court agrees with that statement. *Motion* [#70] at 9-10.  However, this is not a situation where there is clear video evidence of the entirety of the events at issue.  *Ex. G* [#73] (showing the intake module from two angles);[8] *Estate of Valverde*, 967 F.3d at 1059 (stating that clear video evidence must generally be credited over other types of contrary evidence).  Here, particularly, neither intake module video shows what happened at the bottom of the stairs, where Defendant Kellison's actions (whatever they were) took place. Thus, although the videos do hold some evidentiary weight regarding what happened leading up to Defendant Kellison's actions (as further discussed below), the Court finds that, standing alone, the videos neither prove nor disprove whether Defendant Kellison's purported actions were objectively reasonable under the circumstances.

Thus, the Court is primarily left with the parties' and witnesses' written statements regarding the incident.  According to Deputy Fournet:

> Inmate Johnson was very argumentative, and began dragging his feet when taken out of the cell.  I went ahead of the group and met them at the bottom of the staircase and observed them coming down the stairs.  Inmate Johnson continued to loudly yell and resist while being escorted down the stairs.  It appeared as if inmate Johnson was wanting to intentionally cause himself and Deputies to fall.  Sgt. Kellison was behind the inmate holding onto him

---

[8] Defendant Reiss's body-cam footage does not start until immediately after these events, i.e., when Defendant had been hoisted from the ground to be placed into the restraint chair. *Ex. H.*

and Deputy Palmer had a hold of his left arm.  I went up a couple of steps just in case they fell, so that I could break Deputy Palmer's fall.  They came down the stairs quickly and inmate Johnson was taken to the floor once they reached the bottom of the stairs as he continued to resist.

*Ex. E* [#70-8] at 2.

According to Deputy Gerhart:

[Plaintiff] was brought out of the cell and immediately started going dead weight on Sergeant Kellison and Deputy Palmer, who forced him to stay up and started escorting him downstairs.  When they arrived at the stairs, Johnson began struggling against Sergeant Kellison and Deputy Palmer.  I radioed for a restraint chair to be brought to Intake.  When they got to the bottom of the stairs Johnson was placed on the ground on his stomach and held his legs to make sure he didn't kick.

*Ex. E* [#70-8] at 4.

According to Deputy Palmer, as Plaintiff was escorted from his cell:

I had his left arm and he was physically resisting.  I told him to just walk.  Johnson then started to plant his feet and wouldn't walk.  I took a hold of his index finger and bent it towards his torso to get his attention and also to comply.  He started walking but said to me, "Palmer I want to . . . oh man you have no idea."  I told him that what he was thinking was a bad idea.  We got to the top of the stairs and he started to become uncooperative.  I told him to just walk down the stairs.  He then started tugging and trying to pull away.  I grabbed his left arm and held him up the best I could to prevent him from falling down the stairs.  When we got to the bottom of the stairs he was still resisting.  I took hold of his legs and he was lowered to the ground face up.  Someone called for leg irons to be applied.  I maintained control of his legs until the leg irons were applied.

*Ex. E* [#70-8] at 7.

According to Defendant Martinez:

Inmate Johnson continued to yell at [D]eputy Palmer and Sgt. Kellison while be[ing] escorted and I followed close behind.  As they got to the top of the stairs Inmate Johnson began to stiffen up and become physically resistive.  Both Palmer and Kellison had to hold on to him as he tried to pull away.  It appeared to me if they would not of held on to him, he may have stumbled down the stairs.  It is my observation he may have tired [sic] to do this intentionally.  Deputies struggled to hold him up and escort him down the

-24-

stair case.  All three stumbled on the last stair.  He began to resist hard and I then also grabbed him by the waist and we took him to the floor.  He was placed on his back and I placed my right hand on his chest to hold him down and my left on the right side of his face.  I pushed his face away from Sgt. Kellison and myself as he was yelling and did not want him to attempt to spit on us.  I kept his face turned and did not let him move until a spit sock [was] placed on him.

*Ex. E* [#70-8] at 6.

According to Defendant Kellison:

Deputy Palmer placed Johnson in handcuffs and together we began moving toward the stairs, Palmer on Johnson's left arm, me on his right.  Johnson continued resisting, at one point trying to sit down to impeded [sic] our efforts. He also made threatening statements and called the officers "pussies" while we were trying to control him.  While on the stairs Johnson began to try to pull away as we began to descend.  Palmer still had control of Johnson's left arm, I had to grab his shirt to keep him from throwing himself forward down the last few stairs.  Once at the bottom of the staircase Johnson was lowered to the ground.  I controlled Johnson's head, at one point attempting to apply an infra-orbital pressure point to cause pain and gain compliance.  This had limited effectiveness, although it seemed to get his attention.  Palmer controlled his legs while additional restraints were brought for his feet/legs, and also a restraint chair.

*Ex. E* [#70-8] at 8.

According to Deputy Clem, after Plaintiff had been in the restraint chair for a while:

At approximately 1400 hours, Sgt. Kellison and I attempted to remove Johnson from the restraint chair.  I tried talking to him.  I asked him if he would cooperate being removed from the restraint chair.  He didn't answer me and stared at Sgt. Kellison in a threatening manner.  He then started to accuse Sgt. Kellison [of] trying to suffocate [him] and break his nose.  Sgt. Kellison explained to him that it was infra-orbital pressure point.  Johnson continued to argue about this.  It was clear at that time based on his behavior that he was not ready to be removed from the restraint chair.

*Ex. E* [#70-8] at 4.

According to Plaintiff:

[W]hile cuffed & moving me to a retaliatory cell . . . , [Defendant Kellison] began to cause unnecessary & wanton pain & suffering by bending my

fingers. This force compelled me forward off balance. I pled with Sgt. Kellison to stop, even explained that I couldn't go down stairs like that, & before aproaching [sic] the stairs tried to physicaly [sic] stop. On the stairs I lost my balance & fell forward (2 to 3 steps from the top of the stairs) at the bottom of the stairs & for no other reason than for falling down the stairs or to cause wanton infliction of pain & suffering Sgt. Kellison applied deadly force against me . . . by placing me in a rear naked choke hold. Even though I was not trying to harm anyone & was still cuffed, cutting me of[f] from air and placing me in fear of my life. He then began to smuther [sic] me covering my nose & mouth. Both of these actions were deliberat[e]ly indif[f]erent to my health & well being & denied me minimal civilized measures of life's necessities . . . Air! Then "to cause pain & gain compliance" even though no order was given, Sgt. Kellison applied an infra orbatal [sic] preasure [sic] point grinding his open palm into my nose & making circle motions causing severe pain & causing me to bleed. There were 15 other officers present & I was handcuffed still. This force was excessive to the situation & amounted to punishment.

*Am. Compl.* [#6] at 5-6.[9]

Defendants stress that Plaintiff was resisting, and it appears clear that Plaintiff resisted removal from his cell to at least some degree, but he was handcuffed from behind from the moment he left his cell and held by two jail officials as he was maneuvered toward the stairs. One of those officials (either Deputy Palmer or Defendant Kellison) held or manipulated at least one of Plaintiff's fingers to gain his compliance. In the video, officers can be seen taking Plaintiff across the second floor balcony to the top of the stairs where, according to Defendants, Plaintiff resisted and, according to Plaintiff, he lost his balance due to his handling by the deputies.

However, the facts are scant as to whether Plaintiff, a handcuffed detainee, was *actively* resisting to the point that Defendant Kellison's actions were objectively reasonable under the circumstances at the time the relevant force was applied at the bottom of the

---

[9] The Court notes that it disregards all statements consisting of legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

stairs.  *See, e.g.*, *Martinez v. New Mexico Dep't of Pub. Safety*, 47 Fed. App'x 513, 515-17 (10th Cir. 2002) (denying qualified immunity where the arrestee was handcuffed, *verbally* resisted complying with officer's directives, and was then maced by the officer).  Here, the video shows Plaintiff standing for a moment at the bottom of the stairs, seemingly, for the brief moment shown, not resisting before he was taken down and out of view of the camera.

The officers' statement provide little illumination on this issue.  Deputy Fournet merely states that Plaintiff "continued to resist," with no further description.  *Ex. E* [#70-8] at 2.  Deputy Gerhart only states that, "[w]hen they got to the bottom of the stairs Johnson was placed on the ground on his stomach and held his legs to make sure he didn't kick." *Ex. E* [#70-8] at 4.  He does not state that Plaintiff actually tried to kick.  Deputy Palmer merely states: "When we got to the bottom of the stairs he was still resisting.  I took hold of his legs and he was lowered to the ground face up.  Someone called for leg irons to be applied.  I maintained control of his legs until the leg irons were applied."  *Ex. E* [#70-8] at 7.  Again, there is no description of how Plaintiff was resisting or that he was actually trying to inflict physical injuries on the deputies.

Defendant Martinez provides a slightly more detailed account: "He began to resist hard and I then also grabbed him by the waist and we took him to the floor.  He was placed on his back and I placed my right hand on his chest to hold him down and my left on the right side of his face.  I pushed his face away from Sgt. Kellison and myself as he was yelling and did not want him to attempt to spit on us.  I kept his face turned and did not let him move until a spit sock [was] placed on him."  *Ex. E* [#70-8] at 6.  However, against this account, the video shows Plaintiff standing calmly for a moment before he was taken down,

and there is also no indication that Plaintiff actually attempted to spit on anyone.  *See also Am. Compl.* [#6] at 6 (affirmatively stating "I wasn't spitting").  This begs the question of whether the "hard" resistance mentioned by Deputy Martinez was merely verbal.

Finally, Defendant Kellison states: "Once at the bottom of the staircase Johnson was lowered to the ground.  I controlled Johnson's head, at one point attempting to apply an infra-orbital pressure point to cause pain and gain compliance.  This had limited effectiveness, although it seemed to get his attention.  Palmer controlled his legs while additional restraints were brought for his feet/legs, and also a restraint chair."  *Ex. E* [#70-8] at 8.  Again, there is no detail here explaining how Plaintiff was resisting, not to mention how Plaintiff was purportedly *actively* resisting to the point that Defendant Kellison's actions were objectively reasonable under the circumstances.  Verbal resistance or, for example, a mere wiggle of the body, is simply not enough to constitute *active* resistance.  *See, e.g.*, *Martinez*, 47 Fed. App'x at 515-17; *see also Am. Compl.* [#6] at 6 (stating "I was not trying to harm anyone & was still cuffed").  In short, evidence is slim regarding how Plaintiff was resisting, whether a reasonable officer would have feared that Plaintiff, a handcuffed man who was in the physical control of some officers inside of a jail facility and surrounded by a large number of other officers, might inflict harm on them, and what exactly Plaintiff might do in order to justify the reasonableness of the force used against him.

Regarding the extent of Plaintiff's injury, Plaintiff states that Defendant Kellison's actions "caus[ed] severe pain & caus[ed] me to bleed."  *Am. Compl.* [#6] at 6.  Within minutes of this incident, though, Plaintiff denied needing any medical treatment.  *Ex. H* at 10:51; *Ex. I* [#70-12] at 1.  Thus, although Plaintiff was injured, the injury appears to have been de minimus.

The Court collectively addresses the factors regarding the relationship between the need for the use of force and the amount of force used, any effort made by the officer to temper or to limit the amount of force, the severity of the security problem at issue, and the threat reasonably perceived by the officer.   *Kingsley*, 576 U.S. at 397.   All of these are largely informed by the foregoing discussion regarding whether Plaintiff was actively resisting.   For example, the need for the use of force depends in large part on Plaintiff's resistance.   Given that the record is unclear about that, it is difficult to compare the relationship between the need for the use of force and the amount of force used.   Similarly, there is little in the record regarding the immediate threat perceived by Defendant Kellison (or which would have been perceived by a reasonable officer in his position) from Plaintiff, who was handcuffed behind his back.   It is also possible that Defendant Kellison used force at this time in order to prevent the need for use of even greater force in case Plaintiff acted out more, but, again, there is no evidence in the record on this point.   Of course, events here were occurring quickly.   However, the parties have directed the Court's attention to no evidence that there was not enough time to make reasoned decisions regarding Plaintiff's handling.   In short, the detail is murky regarding what precisely was occurring to cause Defendant Kellison to take the action he did.

Taking the evidence in a light most favorable to Plaintiff, he accidentally stumbled down the stairs, he was taken to the ground in a rear choke-hold and then had intra-orbital pressure point applied to him (enough to cause a bloody nose), despite the fact that he was not actively resisting and/or was already effectively subdued by officers.   *See Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1186 (10th Cir. 2015).   This is not a case like *Chrisco v. Goodrick*, No. 17-cv-00073-CMA-MEH, 2018 WL 3069486, at *3 (D. Colo. June 21,

2018), where the evidence indicated that the prison official performed an infra orbital pressure point tactic in an effort to control a convicted prisoner who had jumped toward him and was actively resisting his restraint attempts. Rather, this case is more like *Gouskos v. Griffith*, 122 F. App'x 965, 976 (10th Cir. 2005), where the Tenth Circuit Court of Appeals reversed the district court's grant of qualified immunity where the plaintiff submitted evidence that an officer put "him in a chokehold and chok[ed] him almost to unconsciousness when he was already on the ground, he was exclaiming that he was not resisting, and three other officers were sitting on him, holding his legs, and handcuffing him . . . ." *See also Estate of Booker v. Gomez*, 745 F.3d 405, 425 n.27 (10th Cir. 2014) (noting that, "[a]lthough unpublished, *Griffith*'s reasoning is persuasive for chokehold cases in which individuals were handcuffed and/or not resisting").

In short, the Court finds that Plaintiff has provided sufficient evidence to demonstrate that there is a genuine issue of material fact regarding whether Defendant Kellison used excessive force here. *See, e.g., id.*, at 412 n.3 ("It is disputed whether Mr. Booker yelled profanities at Deputy Gomez, whether he became uncooperative, and whether he disobeyed her orders to sit down. Because the Plaintiffs contest this fact and the video recording lacks audio, we must resolve the dispute in their favor." (internal citation omitted)); *id.* at 412 n.4 ("According to the Defendants, at this time Mr. Booker yelled more profanities and refused to obey Deputy Gomez's order to enter the cell. The Plaintiffs dispute this, contending Mr. Booker was merely returning to get his shoes before entering cell I–8. Because the Plaintiffs' statement of disputed material facts asserts 'there was nothing unusual about Mr. Booker's behavior,' and the video does not suggest otherwise, we must resolve this disputed fact in their favor." (internal citation omitted)).

### ii.    Qualified Immunity

Defendant Kellison asserts a qualified immunity defense.  *Motion* [#70] at 10.  When a defendant raises qualified immunity on summary judgment, the burden shifts to the plaintiff to satisfy a strict two-part test.  *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000).  If the plaintiff does not meet his burden of demonstrating both of these elements, then the defendant is entitled to qualified immunity.  *Nelson*, 207 F.3d at 1206.

First, taking the facts in a light most favorable to the plaintiff, the plaintiff must provide evidence demonstrating that the defendant's actions violated a constitutional or statutory right.  *Id.*  Here, as demonstrated in the foregoing section, Plaintiff has adequately done so with respect to his excessive force claim against Defendant Kellison regarding the events that occurred at the bottom of the staircase.

Second, the plaintiff has the burden of showing that "the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue."  *Id.* (quoting *Albright v. Rodriguez*, 51 F.3d 1531, 1534-35 (10th Cir. 1995) (citations omitted)).  "Ordinarily, a plaintiff may show that a particular right was clearly established at the time of the challenged conduct by identifying an on-point Supreme Court or published Tenth Circuit decision; alternatively, the clearly established weight of authority from other courts must have found the law to be as he maintains."  *A.M. v. Holmes*, 830 F.3d 1123, 1135 (10th Cir. 2016) (internal quotation marks and alterations omitted).  "However, we do not always require case law on point, and the Supreme Court has warned that officials can still be on notice that their conduct violates established law even in novel factual circumstances."  *Id.* (internal quotation marks and citations omitted).  "We have therefore adopted a sliding scale to determine when law is clearly established."  *Id.*  "The

more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Id.* at 1135-36. It is not necessary to show that "the very action in question has previously been held unlawful, [but] in the light of pre-existing law the unlawfulness must be apparent." *Id.* at 1136 (internal alterations and quotation marks omitted).

Plaintiff does not cite to any cases demonstrating a clearly established right.[10] However, in *Estate of Booker v. Gomez*, 745 F.3d at 249, the inmate "was handcuffed, prone on his stomach, and not resisting while much of the disproportionate use of force occurred." The Tenth Circuit "conclude[d] not only that a reasonable jury could find the Defendants violated Mr. Booker's due process right [regarding excessive force], but also that this right was clearly established at the time of their conduct." *Estate of Booker*, 745 F.3d at 429. Although the use of force in *Estate of Booker* was more severe than the use of force here, the Court finds that, taking the underlying evidence in a light most favorable to Plaintiff, Defendant Kellison "was on notice that use of such force on a person who is not resisting and who is restrained in handcuffs is disproportionate." *Id.*; *see, e.g.*, *Stevenson v. City of Albuquerque*, No. CIV 17-855 JB/LF, 2020 WL 1906065, at *29 (D.N.M. Apr. 18, 2020) (noting that *Booker* holds "that clearly established law put the defendants on notice that the use of significant or lethal force on a person who is not resisting and who is

_____

[10] Plaintiff may have attempted to do so by citing "Fitzgerald v. Corr. Corp. of Am., 2009 U.S. Dist. LE . . . 10th Cir (2009)," *see Response* [#95] at 13, but neither Defendants nor the Court has been able to find the case based on this partial citation. *See Reply* [#96] at 7. To the extent Plaintiff may have been citing *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134 (10th Cir. 2005), the facts there concern deliberate indifference to medical care in connection with an inmate who was diabetic with a history of low blood sugar and seizures. The facts in *Fitzgerald* bear no relationship to the facts here and therefore cannot demonstrate clearly established law here.

restrained in handcuffs is disproportionate") (internal quotation marks and brackets omitted)); *cf. Edwards v. Harmon*, No. CIV-18-347-SPS, 2019 WL 6841980, at *8 (E.D. Okla. Dec. 16, 2019) (holding that *Booker* did not demonstrate clearly established law in a case where the inmate was not in handcuffs and was resisting).  Other Tenth Circuit cases have held/reaffirmed that the law is clearly established "that officers may not continue to use force against a suspect who is effectively subdued."  *Perea v. Baca*, 817 F.3d 1198, 1201, 1204-05 (10th Cir. 2016); *McCoy v. Meyers*, 887 F.3d 1034, 1053 (10th Cir. 2018) (citing *Perea*).  Here, assuming that a jury believes Plaintiff that he was not actively resisting and/or was effectively subdued at the time Defendant Kellison utilized force against him, the Court finds that the law here was clearly established.

Accordingly, the Court **recommends** that the Motion [#70] be **denied** to the extent that Defendant Kellison in his individual capacity seeks entry of summary judgment in his favor on Plaintiff's Fourteenth Amendment excessive force claim regarding force used at the staircase based on qualified immunity.

### iii.    Official Capacity

Plaintiff also sues Defendant Kellison in his official capacity.  *Am. Compl.* [#6] at 3. "An action against a person in his official capacity is, in reality, an action against the government entity for whom the person works."  *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1009 (10th Cir. 1998); *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978).  To assert a municipal liability claim against the City and County of Denver, Plaintiff must provide evidence showing that: (1) his constitutional rights were violated; and (2) a municipal policy or custom was the moving force behind the constitutional deprivation.

*Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).

Here, as demonstrated above, Plaintiff has provided evidence demonstrating that there is a genuine issue of material fact regarding whether his constitutional rights were violated. However, Defendants presented no argument in the Motion [#70] concerning the second element, and Plaintiff was therefore not required to provide evidence on that issue. *See Jewell v. State Farm Mut. Auto. Ins. Co.*, No. 18-cv-02536-KLM, 2020 WL 1627348, at *5 (D. Colo. Feb. 26, 2020) (discussing that on summary judgment, it is the defendants' burden to point out where they believe the plaintiff lacks evidence and holding that the plaintiff "is not required to respond to an argument which was not directly made" in the motion). Thus, the Court finds that Defendant Kellison has failed to show that summary judgment in his favor is appropriate on this portion of the claim.

Accordingly, the Court **recommends** that the Motion [#70] be **denied** to the extent that Defendant Kellison in his official capacity seeks entry of summary judgment in his favor on Plaintiff's Fourteenth Amendment excessive force claim regarding force used at the staircase.

### 2.     Procedural Due Process

Plaintiff's Fourteenth Amendment due process claim overlaps significantly with his First Amendment access to the courts claim. The main thrust of Plaintiff's claim here appears to be that he was placed under lockdown without due process and therefore was unable to call his attorney and/or attend hearings that day, which interfered with his right to appear at his court cases. To the extent Plaintiff's Fourteenth Amendment claim is better characterized as a First Amendment claim, the Court has analyzed it as such in its

discussion above regarding access to the courts.

The primary basis for the remainder of Plaintiff's Fourteenth Amendment due process claim concerns the imposition of the two-day disciplinary lockdown which was later reduced to one day. *Response* [#95] at 7 ("Because the impedement [sic] on Mr. Johnson's liberty interest to call his attorney is solely based on the disciplinary lockdown[,] procedural due process was required."). Plaintiff appears to be arguing that his due process rights were violated because the lockdown was not approved or reviewed until 6:02 p.m. later that same day. *Id.* at 6 (citing *Ex. D* [#70-7]). He also asserts as support for this claim that, when the lockdown was reviewed, the second (and last) day was vacated. *Response* [#95] at 6.

Pretrial detainees, like Plaintiff, "may not be punished prior to an adjudication of guilt in accordance with due process of law." *Routt*, 764 F. App'x at 768 (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). However, pretrial detainees may be subjected "to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." *Routt*, 764 F. App'x at 768 (quoting *Bell*, 441 U.S. at 536-37). Thus, when reaching the merits of this type of claim, the Court "must ask whether an expressed intent to punish on the part of detention facility officials exists. If so, liability may attach. If not, a plaintiff may still prove unconstitutional punishment by showing that the restriction [or condition] in question bears no reasonable relationship to any legitimate governmental objective." *Routt*, 764 F. App'x at 768 (quoting *Blackmon v. Sutton*, 734 F.3d 1237, 1241 (10th Cir. 2013)).

"Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are

discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial." *Routt*, 764 F. App'x at 768-69 (quoting *Bell*, 441 U.S. at 540). In other words, "the effective management of the detention facility once the individual is confined is a valid objective that may justify imposition of conditions and restrictions of pretrial detention and dispel any inference that such restrictions are intended as punishment." *Routt*, 764 F. App'x at 769 (quoting *Bell*, 441 U.S. at 540). Relying on Supreme Court precedent, the Tenth Circuit Court of Appeals has cautioned that these decisions "are peculiarly within the province and professional expertise of corrections officials, and, in the absence of *substantial* evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Routt*, 764 F. App'x at 769 (quoting *Bell*, 441 U.S. at 540 n.23) (emphasis added).

Plaintiff appears to believe that, before any restriction or condition could be imposed on him that was more restrictive than that of the general population at the facility, he was entitled to procedural due process protections. *Response* [#95] at 6-7. That is simply not the case, however. Such restrictions and conditions are permitted *unless they amount to punishment*. In other words, mere restrictions and conditions, such as loss of privileges, are permitted to be imposed for virtually any reason connected to effective prison management. *See Blackmon*, 734 F.3d at 1241 ("Where exactly do we draw the line between what does and doesn't constitute "punishment"? Historically, the government has enjoyed the authority to detain until trial those defendants who pose a flight risk. And no doubt those who find themselves detained in this manner experience a great many restrictions on their liberty—restrictions many of us would regard as punishment in

themselves."). In short, because the applicable case law "allows prohibitions and restrictions that are reasonably related to legitimate penological interests," Plaintiff "must include sufficient facts" showing "that the actions of which he complains were *not* reasonably related to legitimate penological interests." *See Gee v. Pacheco*, 627 F.3d 1178, 1187-88 (10th Cir. 2010).

Several examples illustrate this point. In *Blackmon v. Sutton*, 734 F.3d at 1242, the Tenth Circuit Court of Appeals held that an eleven-year-old pretrial detainee who was sometimes shackled to a restraint chair for long periods even when there was not any hint that he posed a threat to himself or anyone else, or long after any such threat had dissipated, did not serve any legitimate penological purpose and therefore was impermissible punishment under the Fourteenth Amendment. In *Littlefield v. Deland*, 641 F.2d 729, 730, 732 (10th Cir. 1981), for fifty-six-days a pretrial detainee was placed in a solitary "strip cell" with no windows, no interior lights, no bunk, no floor covering, and no toilet except for a hole in the concrete floor which was flushed irregularly from outside the cell. The detainee was deprived of all clothing and bedding, reading or writing materials, and any articles of personal hygiene. *Littlefield*, 641 F.2d at 730. The Tenth Circuit held that holding "a pretrial detainee under conditions of detention this extreme for such an excessive period as fifty-six days is punishment and, absent a determination of guilt, cannot be imposed in accordance with the due process clause of the fourteenth amendment." *Id.* at 732. In *Colbruno v. Kessler*, 928 F.3d 1155, 1164 (10th Cir. 2019), the Tenth Circuit held that walking an adult pretrial detainee naked through a hospital, where there was no medical need so pressing that a few minutes could not be spared to find replacement clothing, constituted punishment under the Fourteenth Amendment with no legitimate

penological purpose.

On the other side of the scale are those cases where discipline has not been deemed to rise to the level of punishment and/or was deemed to be connected to a legitimate penological purpose.  For example, in *Routt v. Howard*, 764 F. App'x at 769, the Tenth Circuit held that a 72-hour lockdown of pretrial detainees after a sharpened toothbrush was found in a communal shower was not punishment where the alleged actions "support[ed] a reasonable, non-exaggerated response to [the Jail's] legitimate interest in maintaining security and order."  In *Cox v. Denning*, 652 F. App'x 687, 691-92 (10th Cir. 2016), the Tenth Circuit held that, while discomforting, a nighttime-recreation policy for pretrial detainees, forcing the plaintiff-inmate to take his recreation time around midnight, did not constitute punishment because it was designed to permit close monitoring of inmates who might pose a danger to themselves or others.  In *Peoples v. CCA Detention Centers*, 422 F.3d 1090, 1106-07 (10th Cir. 2005), a pretrial detainee was placed in segregation on his arrival at the detention center and kept there for about thirteen months, but the Tenth Circuit held that this did not constitute punishment "due to his plot to escape from his previous pretrial detention facility" and the facility's legitimate interest in segregating him because he was an escape risk.

Finally, the Court notes that the Tenth Circuit has acknowledged that there is a "distinction between punitive and administrative segregation," although, "[a]dmittedly, it is an unclear and murky line that separates these two types of segregation."  *Frazier v. Dubois*, 922 F.2d 560, 563 (10th Cir. 1990) ("We have some difficulty in drawing a line between punitive and non-punitive segregation because most segregation would seem to involve both elements.").  Regardless, it *is* clear that merely enduring "lockdown" without

a due process hearing is, *standing alone*, insufficient to meet the requirements of this claim.

Plaintiff has directed the Court to no case, and the Court has found none through its own research, where restrictions and conditions similar to those of the lockdown status at issue here were deemed to rise to the level of punishment.  *See, e.g.*, *Colbruno*, 928 F.3d at 1164 (separately determining (1) whether the defendants' conduct rose to the level of punishment, and therefore of a Fourteenth Amendment violation, before determining (2) whether the conduct was rationally related to a legitimate governmental objective or was excessive in relation to that purpose).  The Court cannot find that a lockdown of the type endured by Plaintiff amounts to "punishment" where Plaintiff's only real complaint about the lockdown is that he was unable to call his attorney and otherwise access the courts for a period of no more than one day.

Accordingly, the Court **recommends** that summary judgment be entered in favor of Defendants on Plaintiff's Fourteenth Amendment due process claim.

### 3.    Conditions of Confinement

Plaintiff asserts that the "restraint chair incident" violated his Fourteenth Amendment rights based on his "conditions of confinement."  *Response* [#95] at 13-20.

Jail officials have a duty "to provide humane conditions of confinement, including adequate food, clothing, shelter, sanitation, medical care, and reasonable safety from bodily harm."  *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008).  The conditions must comply with "contemporary standards of decency."  *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  When examining a claim regarding conditions of confinement, the Court applies

a two-part test that consists of an objective and subjective component.[11] *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998). "The objective component requires that the alleged deprivation be sufficiently serious," and "[t]he subjective component requires the jail official to have a sufficiently culpable state of mind," meaning deliberate indifference. *Id.*

Jail conditions may be "'restrictive and even harsh'" without violating constitutional rights. *Barney v. Pulsipher*, 143 F.3d 1229, 1311 (10th Cir. 1998) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). "[E]xtreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). "To prevail on the first prong, even severe restrictions do not satisfy the objective component if the inmate is not deprived of 'the minimal civilized measure of life's necessities.'" *McMillan v. Wiley*, 813 F. Supp. 2d 1238, 1250 (D. Colo. 2011) (quoting *Craig*, 164 F.3d at 495). Further, the sufficiency of a conditions-of-confinement claim depends on "the particular facts of each situation; the circumstances, nature, and duration of the challenged conditions must be carefully considered." *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001). While jails must provide humane conditions of confinement, including adequate food, clothing, shelter, sanitation, medical care, and reasonable safety from bodily harm, *see Tafoya*, 516 F.3d at 916, "only those deprivations denying the minimal civilized measure

---

[11]   The Tenth Circuit Court of Appeals has noted that circuit courts "are split on whether [*Kingsley v. Hendrickson*, 576 U.S. 389 (2015),] alters the standard for conditions of confinement and inadequate medical care claims brought by pretrial detainees," because the Second, Seventh, and Ninth Circuits have indicated that *Kingsley* has done so while the Fifth, Eighth, and Eleventh Circuits have ruled that *Kingsley* has not done so and applies only to excessive force claims. *Estate of Vallina v. Cty. of Teller Sheriff's Office*, 757 F. App'x 643, 647 (10th Cir. 2018). The Tenth Circuit has not yet directly determined this issue. *See id.* However, given that the Tenth Circuit has provided some indication (without directly holding) that the standard has not changed at this time, *see Perry v. Durborow*, 892 F.3d 1116, 1121 (10th Cir. 2018), the Court proceeds on the basis that the Fourteenth and Eighth Amendment standards are identical for purposes of Plaintiff's claims. *See Estate of Vallina*, 757 F. App'x at 647.

of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). Therefore, in the absence "of a specific deprivation of a human need," a claim "based on prison conditions must fail." *Shifrin v. Fields*, 39 F.3d 1112, 1114 (10th Cir. 1994).

Here, the Court finds that the evidence regarding the use of restraints for approximately five hours, by itself, does not rise to the level of a constitutional violation. *See, e.g.*, *Saleh v. Ray*, No. Civ. A. 02-3241-CM, 2003 WL 23484639, at *6 (D. Kan. Nov. 12, 2003), *aff'd*, 107 F. App'x 865 (10th Cir. 2004) (stating that "the fact that plaintiff remained in ambulatory restraints for eighteen hours to twenty-four hours does not, itself, rise to the level of an Eighth Amendment violation" (citing *Cunningham v. Eyman*, 17 F. App'x 449, 453-454 (7th Cir. 2001); *Key v. McKinney*, 176 F.3d 1083, 1086 (8th Cir. 1999))).

In *Blackmon*, 734 F.3d at 1247, the case concerning the juvenile pretrial detainee kept in the restraint chair for extended periods, the Tenth Circuit noted a conditions-of-confinement claim under these circumstances "require[s] proof that the defendant prison official in question acted . . . with subjective 'deliberate indifference' to an objectively 'excessive risk to inmate health or safety.'" 734 F.3d at 1247 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (10th Cir. 2013)). Part of Plaintiff's focus here appears to be on whether Defendants were deliberately indifferent to what potentially could have happened to him, rather than whether they were deliberately indifferent to an *excessive* risk. *See, e.g.*, *Am. Compl.* [#6] at 7 (stating that the restraint chair procedures "put me at risk for blood clots" and "could have resulted in death"). However, in the absence of any supporting evidence for these conclusory statements, the Court finds them speculative and not competent

summary judgment evidence.  *See Bones*, 366 F.3d at 875.

According to the video evidence (Exhibit H), the process of putting Plaintiff into the restraint chair ended at 10:51 a.m., and seconds later he verbally stated that he did not want medical care.  Nurse McGurk checked his restraints from 10:51 to 10:52 to make sure they were not too tight.  He was moved to the disciplinary room down a hallway from 10:52 to 10:53, and the door of the disciplinary room was closed at 10:53.  He did not complain about physical discomfort (or worse) at this time.

Nurse McGurk completed a report at 11:18 a.m. stating that, when Plaintiff was placed in the restraint chair at 10:45 a.m., he refused medical care and was told that he needed to have his restraints checked.  *Ex. I* [#70-12] at 1.  Nurse McGurk reported that all four restraints were able to accommodate one full finger width underneath, and that Plaintiff was encouraged to relax.  *Id.*  Nurse McGurk also provided instructions that "[u]se of restraints should not exceed 8 consecutive hours."  *Id.* at 4-5.

Further video evidence (Exhibit H) shows that Plaintiff was checked on at 1:59 p.m. and asked if he was ready to come out.  Plaintiff stated that they could leave him in the chair, "I don't care."  After talking to him for a while, he was left alone again at 2:05 p.m. based on purportedly threatening behavior toward officers.  Although at that time Plaintiff verbally referred to the leg shackles which had been put on him before he was placed in the chair, he did not tell the officers about any physical discomfort (or worse) from the restraint chair itself.

At 2:30 p.m., Deputy Clem, Deputy Palmer, and a nurse double-checked Plaintiff's ankle restraints to ensure they were not too tight.  *Ex. E* [#70-8] at 3, 7.  Although Plaintiff complained at this time that the ankle restraints were too tight, Deputy McNeill was able to

put two fingers in the restraint. *Id.* at 3. Regardless, there is no indication that any Defendant in this case was present or otherwise made aware of Plaintiff's complaint at this time.

The next video (Exhibit H) shows that Plaintiff was checked on again at 3:44 p.m. He said that if they wanted to leave him in the chair, they could leave him in the chair, and if they wanted to take him out of the chair, they could take him out of the chair. Plaintiff was released from the chair at this time. He was told not to stand up too quickly, and the video shows that he stood with no apparent problem and then walked a couple of steps to sit on the bed. No complaints of physical problems can be heard on the video, and the video ends at 3:48 p.m. with Plaintiff remaining in the disciplinary cell.

George D'Amboise, LPN, completed a report at 4:57 p.m. stating that Plaintiff was assessed after his remove from the chair. *Ex. I* [#70-12] at 2. He reported that Plaintiff had circulation in all extremities and no injuries other than some scraping on the back of his left heel. *Id.*

In light of this evidence, the Court cannot find that Plaintiff has provided sufficient evidence on the subjective prong of the inquiry to create a genuine issue of material fact. Plaintiff was checked by a medical professional at least once before, once during, and once after he was in the chair, and he did not complain about any relevant issues when he did see Defendants. Plaintiff was in the chair for approximately five hours, far less than the maximum of eight hours permitted by medical personnel. There is no evidence that Plaintiff showed signs that he was suffering an objectively serious injury while in the chair. Thus, even though Plaintiff states that the chair "caused loss of feeling in [his] hands, trouble breathing, cuts on [his] ankles where [he] was shackled, leg cramps, discomfort in [his]

arms, back pain & [his] feet to grow so sensitive that the slightest move produced severe pain," there is simply no indication that Defendants were aware of this, even though it is clear from the videos that Plaintiff had no problem communicating with jail personnel.  To the extent that Plaintiff argues that Defendants' actions violated internal jail protocols regarding the restraint chair (a point on which the Court makes no comment), this is insufficient on its own to prove a constitutional violation.  *See Portier v. Defusco*, No. 08-cv-00235-WYD-CBS, 2008 WL 5533987, at *6 (D. Colo. Nov. 26, 2008) (stating that the "failure to adhere to administrative regulations  does not equate to a constitutional violation") (quoting *Hovater v. Robinson*, 1 F.3d 1063, 1068 n. 4 (10th Cir. 1993)).  Thus, the Court finds that there is no genuine issue of material fact here, and that Plaintiff fails to provide adequate evidence supporting this claim.

Accordingly, the Court **recommends** that Defendants' Motion [#70] be **granted** to the extent that summary judgment on this claim enter in favor of Defendants and against Plaintiff on his conditions-of-confinement claim.

## IV.  Conclusion

For the foregoing reasons,

IT IS HEREBY **RECOMMENDED** that the Motion [#70] be **GRANTED in part and DENIED in part**.  The Court **recommends** that the Motion be **denied** with respect to Plaintiff's Fourteenth Amendment excessive force claim regarding force used at the staircase by Defendant Kellison in his individual and official capacities.  The Court **recommends** that the Motion be **granted** in all other respects and that judgment enter in favor of Defendants on all other claims.

-44-

IT IS HEREBY **ORDERED** that pursuant to Fed. R. Civ. P. 72, the parties shall have fourteen (14) days after service of this Recommendation to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned.  A party's failure to serve and file specific, written objections waives de novo review of the Recommendation by the District Judge, Fed. R. Civ. P. 72(b); *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions.  *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999);  *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996).  A party's objections to this Recommendation must be both timely and specific to preserve an issue for de novo review by the District Court or for appellate review.  *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated:  September 25, 2020

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge

-45-